JMK/DSK/JCA:KAN/DGR
F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

TIM LEISSNER,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF AN APPLICATION FOR
AN ARREST WARRANT
(18 U.S.C. §§ 371, 1956(h) and 3551 et seq.)

18M514

EASTERN DISTRICT OF NEW YORK, SS:

       JUSTIN MCNAIR, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

       Upon information and belief, in or about and between January 2009 and October

2014, both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant TIM LEISSNER, together with others, did knowingly and willfully

conspire to commit offenses against the United States, namely, being an employee and agent of

an issuer, and being an employee and agent of a domestic concern, and while in the territory of

the United States, to willfully and corruptly make use of the mails and means and

instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and

authorization of the payment of any money, offer, gift, promise to give, and authorization of the

giving of anything of value, to a foreign official, and to a person, while knowing that all or a

portion of such money and thing of value would be and had been offered, given, and promised to

a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his

or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of

the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such

foreign official to use his or her influence with a foreign government and agencies and

instrumentalities thereof to affect and influence acts and decisions of such government and

agencies and instrumentalities, in order to assist U.S. Financial Institution #1, a financial

institution the identity of which is known to the affiant, and others in obtaining and retaining

business, for and with, and directing business to, LEISSNER, U.S. Financial Institution #1, and

others, contrary to the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code,

Sections 78dd-1, 78dd-2, and 78dd-3. In furtherance of the conspiracy and to effect its objects,

within the Eastern District of New York and elsewhere, the defendant TIM LEISSNER, together

with others, committed and caused to be committed overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

Upon information and belief, in or about and between January 2009 and October

2014, both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant TIM LEISSNER, together with others, did knowingly and willfully

conspire to commit an offense against the United States, namely, to knowingly and willfully

circumvent and cause to be circumvented a system of internal accounting controls at U.S.

Financial Institution #1, contrary to the FCPA, Title 15, United States Code, Sections

78m(b)(2)(B), 78m(b)(5), and 78ff(a). In furtherance of the conspiracy and to effect its objects,

within the Eastern District of New York and elsewhere, the defendant TIM LEISSNER, together

with others, committed and caused to be committed overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

Upon information and belief, in or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TIM LEISSNER, together with others, did knowingly and intentionally conspire to:

(i) transport, transmit, and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (a) with the intent to promote the carrying on of specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5), and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5), and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law; contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(ii) engage in one or more monetary transactions within the United States involving property of a value greater than $10,000 that is derived from specific unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1,

78dd-2, 78dd-3, 78m(b)(5), and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, knowing that the funds were the proceeds of some unlawful activities and were in fact proceeds of some unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5), and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

The source of your affiant's information and the grounds for his belief are as follows:[1]

1.     I am a Special Agent with the FBI and have been involved in the investigation of numerous cases involving violations of the FCPA, wire fraud, and money laundering, among other offenses.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation, among other sources of evidence.

I.     The Defendant

2.     The defendant TIM LEISSNER, a German national, was employed by various subsidiaries of U.S. Financial Institution #1 from approximately 1998 to 2016, including Subsidiary A of U.S. Financial Institution #1, a subsidiary the identity of which is known to the

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

affiant, between approximately November 2011 and December 2015. Prior to his separation

from U.S. Financial Institution #1 in approximately February 2016, LEISSNER was the

Southeast Asia Chairman and a Managing Director of U.S. Financial Institution #1's Investment

Banking Division ("IBD"), and he was responsible for U.S. Financial Institution #1's

relationship with 1Malaysia Development Berhad ("1MDB"), Malaysia's state-owned and state-

controlled investment development company. LEISSNER was an "employee" and "agent" of

an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a),

and an "employee" and "agent" of a "domestic concern" within the meaning of the FCPA, Title

15, United States Code, Section 78dd-2(a).

II.    Relevant Entities and Individuals

        3.    Co-Conspirator #1, an individual whose identity is known to the affiant,

was a Malaysian national who advised on the creation of the Terengganu Investment Authority

("TIA"), 1MDB's predecessor entity. Co-Conspirator #1 has never held a formal position at

1MDB or with the Government of Malaysia, but worked as a consultant on behalf of 1MDB and

other government officials on numerous financial transactions and projects involving U.S.

Financial Institution #1.

        4.    Co-Conspirator #2, an individual whose identity is known to the affiant,

was a Malaysian national who was employed at U.S. Financial Institution #1 from approximately

2005 to May 2014. At the time of his departure from the bank, Co-Conspirator #2 was a

Managing Director. Co-Conspirator #2 was an "employee" and "agent" of an "issuer" within

the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

        5.    1MDB was a strategic investment and development company wholly

owned by the Government of Malaysia through its Ministry of Finance ("MOF"). It was formed

in or around 2009, when the Malaysian government took federal control of TIA, which had

previously been the sovereign wealth fund of the state of Terengganu in Malaysia. 1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these investments. 1MDB's development projects were focused in the areas of energy, real estate, tourism, and agribusiness. 1MDB was overseen by senior Malaysian government officials, was controlled by the Malaysian government, and performed a government function on behalf of Malaysia. 1MDB was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

6.     U.S. Financial Institution #1 was a global investment banking, securities, and investment management firm incorporated in Delaware and headquartered in New York, New York. It conducted its activities primarily through various subsidiaries and affiliates, including those that employed LEISSNER and Co-Conspirator #2. U.S. Financial Institution #1 had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and was required to file reports with the U.S. Securities and Exchange Commission under Section 15(d) of the Exchange Act (Title 15, United States Code, Section 78o(d)). As such, U.S. Financial Institution #1 was an "issuer" as that term is used in the FCPA.

7.     Subsidiary A, a subsidiary of U.S. Financial Institution #1, was incorporated in Delaware and had offices in Hong Kong. As such, Subsidiary A of U.S. Financial Institution #1 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and 78dd-2(h)(1)(B).

8.     Foreign Investment Firm A, a company the identity of which is known to the affiant, was a public joint stock company incorporated under the laws of the United Arab

Emirates and a subsidiary of Foreign Agency A, an investment fund wholly owned by the

Government of the United Arab Emirates, a fund the identity of which is known to the affiant.

9.    Shell Company #1, a company the identity of which is known to the

affiant, was an entity incorporated in the British Virgin Islands ("BVI") in approximately March

2012, which was purportedly owned by Foreign Agency A and Foreign Investment Firm A, and

had a very similar name to Foreign Investment Firm A which made it appear like it was the same

entity or associated with it.    Shell Company #1 maintained a bank account at Foreign Financial

Institution #1 in Switzerland, a financial institution the identity of which is known to the affiant.

Based on public reporting, I have learned that Foreign Agency A and Foreign Investment Firm A

have stated that they are not affiliated with Shell Company #1.

10.    1MDB Official #1, an individual whose identity is known to the affiant,

was a Malaysian national and high-ranking official at 1MDB between at least January 2012 and

July 2015.    1MDB Official #1 served as one of the principal points of contact between 1MDB

and U.S. Financial Institution #1 in connection with 1MDB business.    1MDB Official #1 was a

"foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-

1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

11.    1MDB Official #2, an individual whose identity is known to the affiant,

was a Malaysian national and high-ranking official of 1MDB from at least March 2012 to

November 2014.    1MDB Official #2 was a "foreign official" within the meaning of the FCPA,

Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

12.    1MDB Official #3, an individual whose identity is known to the affiant,

was a Malaysian national and a high-ranking official at 1MDB from at least May 2010 to May

2015. 1MDB Official #3 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

13. 1MDB Official #4, an individual whose identity is known to the affiant, was a Malaysian national and high-ranking official at 1MDB from at least 2010 to April 2013. 1MDB Official #4 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

14. 1MDB Official #5, an individual whose identity is known to the affiant, was a Malaysian national and high-ranking official at 1MDB from at least 2012 to 2015. 1MDB Official #5 was a principal point of contact between 1MDB and U.S. Financial Institution #1 in connection with three bond offerings by 1MDB in 2012 and 2013. 1MDB Official #5 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

15. Malaysian Official #1, an individual whose identity is known to the affiant, was a Malaysian national and high-ranking official in the Malaysian government and the MOF from at least 2009 to at least 2018 and had approval authority over 1MDB business decisions. Malaysian Official #1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

III.    The Criminal Scheme

A.    Overview

16. As described below, the charges set forth herein stem from an overarching criminal scheme to divert billions of dollars in funds belonging to 1MDB to members of the conspiracy and others, and to pay bribes to secure and retain business for U.S. Financial Institution #1. As part of that scheme, the co-conspirators agreed to and did circumvent the internal controls of U.S. Financial Institution #1.

17.    As part of the diversion of funds belonging to 1MDB, over approximately four years, LEISSNER and Co-Conspirator #1, together with others, misappropriated and diverted billions of dollars in funds from 1MDB for their own personal benefit and to benefit others who participated in the scheme and their relatives.    Some of the funds misappropriated and diverted from 1MDB were used to purchase, among other things, luxury residential real estate in the United States, pay gambling expenses at a Las Vegas casino, acquire more than $100 million in artwork from an auction house in New York, New York, invest in a major real estate development project in New York, New York, purchase a mega yacht, pay private jet expenses, purchase expensive jewelry, and fund the production of major Hollywood films. 1MDB maintained no interest in the assets purchased with the diverted funds and saw no returns on these investments.    In the course of their diversion and misappropriation, the funds were transferred through multiple shell companies through various countries, including Switzerland and Singapore, before reaching the participants in the scheme.    At least some of these funds passed through the United States, and specifically, the Eastern District of New York.

18.    In furtherance of this scheme, between approximately January 2009 and October 2014, LEISSNER, acting on behalf of U.S. Financial Institution #1, and Co-Conspirator #1, together with others, made and endeavored to make corrupt payments to 1MDB officials and to a family member of Malaysian Official #1 to influence those officials to obtain and retain business from 1MDB for, and direct business to, U.S. Financial Institution #1.    Specifically, LEISSNER, Co-Conspirator #1, and others caused approximately $13 million in corrupt payments to be made to bank accounts controlled by the foreign officials they sought to influence, including 1MDB Official #1, 1MDB Official #2, 1MDB Official #3, 1MDB Official #4, and 1MDB Official #5, and corruptly caused approximately $1.3 million to be paid for

jewelry for the wife of Malaysian Official #1.    Between in or about May 2012 and March 2013,

U.S. Financial Institution #1 was selected by 1MDB to be the lead bank on three 1MDB bond

offerings that earned U.S. Financial Institution #1 more than $600 million in fees and other

revenue.    Following the closing of these bond offerings, LEISSNER and Co-Conspirator #1

continued to seek 1MDB business for U.S. Financial Institution #1, including work on the initial

public offering ("IPO") of 1MDB's energy business.    At the same time, LEISSNER, Co-

Conspirator #1, and others continued to make payments to 1MDB officials, including 1MDB

officials who were in a position to influence the awarding of business to U.S. Financial

Institution #1.    At least some of the funds used to pay foreign officials as part of this scheme

were derived from the proceeds of the bonds issued by 1MDB in 2012 and 2013 with U.S.

Financial Institution #1's assistance.    These funds were thereafter transferred through multiple

shell companies before reaching the foreign officials.    At least some of these funds passed

through the United States, and specifically, the Eastern District of New York.

        19.     As part of the scheme, LEISSNER and Co-Conspirator #2, together with

others, conspired to and did evade the internal accounting controls and policies of U.S. Financial

Institution #1, which were intended to address, among other things, the prevention of bribery,

money laundering, conflicts of interest, personal investments, and the use of intermediaries in

financial transactions to ensure compliance with those accounting controls, policies, and laws.

LEISSNER and Co-Conspirator #2 circumvented U.S. Financial Institution #1's internal

accounting controls in order to carry out the bribery scheme described above, as well as to

facilitate kickback payments to themselves and others in connection with business that

LEISSNER and Co-Conspirator #2 were securing for, and on behalf of, U.S. Financial

Institution #1.    Multiple groups at U.S. Financial Institution #1 had responsibility for managing

and overseeing many of these compliance policies, including an anti-bribery policy. In addition, transactions—including the three 1MDB bond issuances handled by U.S. Financial Institution #1—were reviewed and approved by regional and firmwide committees at U.S. Financial Institution #1. These committees were responsible for reviewing, among other things, the compliance and reputational risks of the transactions. The firmwide committees included high-level executives at U.S. Financial Institution #1's headquarters in New York, New York. Before and during the three 1MDB bond deals, compliance personnel and committee members were focused on whether these and other transactions involved Co-Conspirator #1—an individual with whom compliance and legal personnel at U.S. Financial Institution #1 had determined U.S. Financial Institution #1 should not do business. Multiple times, when compliance personnel and committee members specifically asked LEISSNER, Co-Conspirator #2, and others if Co-Conspirator #1 was involved in any of the transactions, LEISSNER and Co-Conspirator #2 told them that Co-Conspirator #1 had no involvement or failed to disclose his involvement. However, as LEISSNER and Co-Conspirator #2 knew, Co-Conspirator #1 was in fact working on behalf of 1MDB and Malaysian Official #1 throughout the bond transactions.

      B.     Relevant Internal Accounting Controls of U.S. Financial Institution #1

           20.     Based on my review of emails and documents obtained from U.S. Financial Institution #1, and interviews of current and former employees of U.S. Financial Institution #1, I am aware that throughout the relevant time period, U.S. Financial Institution #1 had various company-wide and division-specific internal accounting controls covering, among other topics, bribery, money laundering, conflicts of interest, personal investments, outside activities, and the use of intermediaries in financial transactions. A group within the bank's global compliance function (the "Compliance Group") was responsible for managing and

overseeing many of the compliance policies and internal accounting controls, including U.S. Financial Institution #1's anti-bribery policy.

21.    The Compliance Group was supported by a group of personnel within U.S. Financial Institution #1's legal department (the "Intelligence Group"), among other entities. The Intelligence Group was responsible for, among other things, conducting inquiries or investigations, referred to as "due diligence," related to fraud, corruption, sanctions, and money laundering, as well as analyzing a potential client's impact on reputational risk to the bank.    The Intelligence Group's team of lawyers and internal and external auditors conducted due diligence on investment banking and other transactions, both before and throughout the existence of certain projects.    The Intelligence Group's due diligence included collecting information about anyone who the "deal team"—employees of U.S. Financial Institution #1 responsible for interacting with the client and executing the transaction—knew were involved with the transaction, including any person or business acting as a third-party finder or intermediary of U.S. Financial Institution #1, and consisted of reviewing public records and utilizing third parties to conduct additional screening.    Any red flags related to a deal that were identified by the Intelligence Group were to be raised to senior management and various committees to mitigate any potential or actual risk.    The Intelligence Group's review and approval were required for all transactions involving high-risk jurisdictions, including for advisory deals.    The need for the Intelligence Group and the Compliance Group's review was made known to the IBD bankers through policies and training, and through their participation in the committee processes.    The Intelligence Group relied on the deal team to begin the due diligence process by providing all relevant names and background information of those associated with the deal, and to obtain any additional information needed from the client.    Regional and firmwide committees, the

Intelligence Group, the Compliance Group, and other groups reviewed U.S. Financial Institution #1's projects to ensure that business, suitability, and reputational standards were maintained, including that transactions were executed in accordance with management's general or specific authorization.

    C.    <u>LEISSNER and Co-Conspirator #2's Early Work With Co-Conspirator #1 to Win Business for U.S. Financial Institution #1</u>

    22.    Based on my review of emails and documents obtained through the course of the investigation, among other sources of evidence, I have learned that as early as 2009, LEISSNER and Co-Conspirator #2 worked with Co-Conspirator #1 to secure business for U.S. Financial Institution #1. For example, in approximately January 2009, LEISSNER and Co-Conspirator #1 discussed a role for U.S. Financial Institution #1 in the creation of and potential fundraising for TIA, the predecessor of 1MDB. At that time, Co-Conspirator #1 was involved in the creation of TIA and served as an adviser to it and its founders.

    23.    This TIA transaction was referred to as "Project Tiara" within U.S Financial Institution #1, and, based on my review of emails and other documents, among other sources of evidence, I have learned that LEISSNER and Co-Conspirator #2 were two of the main bankers responsible for developing the relationship with TIA officials, and that LEISSNER and Co-Conspirator #2 were aware of and used Co-Conspirator #1's connections to high-ranking Malaysian and TIA officials to further that relationship. For example:

    a.    On or about January 5, 2009, Co-Conspirator #2 emailed LEISSNER and Co-Conspirator #1 and detailed a meeting Co-Conspirator #2 had with Co-Conspirator #1 about business opportunities for TIA. Evidence obtained from U.S. Financial Institution #1 shows that LEISSNER and Co-Conspirator #2 met with Co-Conspirator #1 the next day, after which Co-Conspirator #1 emailed, "pleasure to meet with the both of you and

look forward to forming a good working relationship with ure kindselves [sic] and [U.S. Financial Institution #1]." A future 1MDB officer is copied on this email. LEISSNER responded, "[Co-Conspirator #1] and Team, . . . look forward to a great partnership on some of these projects and others that we can [sic] up with over time."

    b. On or about January 15, 2009, TIA's executive director of business development, who would later become the Executive Director of 1MDB, emailed LEISSNER, Co-Conspirator #1, and Co-Conspirator #2 about Project Tiara. Referring to Co-Conspirator #1's role in the project, this individual stated, "I think it is best to get [Co-Conspirator #1] involve[d] at every stage. [Co-Conspirator #1] will revert on the suitability of dates n [sic] time for the next 48 hrs."

    c. On or about January 15, 2009, Co-Conspirator #2 emailed LEISSNER's administrative assistant, copying LEISSNER, and stated, "can u send mtg request for tim and I and block 8.30-9.30am with [Co-Conspirator #1] at the mandarin. Tim, we should [sic] him some [U.S. Financial Institution #1] affection to make certain he is focused with us on TIA."

    24. As early as his 2009 work on Project Tiara, although LEISSNER was willing to share Co-Conspirator #1's involvement in the transaction with select business employees at U.S. Financial Institution #1, LEISSNER was reluctant to disclose Co-Conspirator #1's involvement to compliance personnel at U.S. Financial Institution #1. For example, in an email dated on or about January 21, 2009, LEISSNER, copying Co-Conspirator #2, confirmed to another U.S. Financial Institution #1 banker that they were working on Project Tiara with Co-Conspirator #1, but, in an email dated on or about January 27, 2009, LEISSNER specifically

instructed Co-Conspirator #2 not to disclose to the Intelligence Group that they were using Co-Conspirator #1 as a consultant.

25.    Ultimately, in approximately February 2009, the Malaysian municipality of Terengganu, with assistance from U.S. Financial Institution #1, officially formed TIA, with the stated purpose of investing and managing that municipality's public funds. To raise capital for its operations, TIA issued and sold Islamic medium term notes, a form of debt security, valued at approximately $1,425,680,000, through a foreign financial institution. Based on my review of emails obtained from U.S. Financial Institution #1 and interviews, among other sources of evidence, I know that Co-Conspirator #1 worked as a consultant with LEISSNER and Co-Conspirator #2 to complete that TIA bond deal without the Intelligence Group's knowledge and that this relationship should have been disclosed to U.S. Financial Institution #1.

26.    Based on publicly-reported information, shortly after the TIA bonds were issued, in or around July 2009, the MOF assumed control of TIA and the more than $1 billion in notes. Thereafter, in approximately September 2009, TIA changed its name to 1MDB and expanded its focus from a regional to a national scope.

D.    LEISSNER and Co-Conspirator #2 Used Co-Conspirator #1 and His Network to Secure 1MDB Business

27.    After the inception of 1MDB, LEISSNER and Co-Conspirator #2 continued to work with Co-Conspirator #1 to secure 1MDB business for U.S. Financial Institution #1.

28.    Based on the investigation, including my review of emails and documents, I have learned that, during this time, although Co-Conspirator #1 publicly denied involvement in 1MDB, he continued to have a behind-the-scenes role at 1MDB following its inception. Moreover, based on my review of emails and other documents, among other sources of evidence,

I have learned that LEISSNER and Co-Conspirator #2 were working with Co-Conspirator #1 due to his role in representing 1MDB. For example:

      a.    On or about September 26, 2009, in connection with a proposed joint venture between 1MDB and a Saudi Arabian oil and gas company, Co-Conspirator #2 emailed LEISSNER about the project and relayed details of a meeting Co-Conspirator #2 had with Co-Conspirator #1, and his hope to secure a role for U.S. Financial Institution #1 in the project. Co-Conspirator #2 told LEISSNER that he had "[m]et with [Co-Conspirator #1]," and that Co-Conspirator #1 was going to "get [them] a date for week of Oct 19 for [a] presentation to [Malaysian Official #1] . . . . JV with 1MDB to co-invest (US$1bn) . . . . I have requested to advise JV Co once its [sic] set up." This meeting occurred on or about October 21, 2009, and included LEISSNER, Co-Conspirator #2, various 1MDB officials, and Malaysian Official #1.

      b.    On or about November 1, 2009, LEISSNER wrote an email to Co-Conspirator #2 regarding "[o]ne idea for 1MDB," and suggested a plan for 1MDB to purchase a stake in a company, which LEISSNER thought was a good idea and would give "[Co-Conspirator #1] . . . immediate credibility." Based on my review of other documents and emails in this case, I believe this refers to Co-Conspirator #1's lack of profile in the business world at the time, and that LEISSNER was suggesting a way to obtain some business credentials for Co-Conspirator #1. Later in the same email chain, Co-Conspirator #2 told LEISSNER he met Malaysian Official #1's children at Co-Conspirator #1's apartment and was working to get them to "join [U.S. Financial Institution #1]," to which LEISSNER responded: "Get them in."

      c.    Two days later, Co-Conspirator #2 emailed LEISSNER again to discuss 1MDB and a visit to New York, New York, by Malaysian Official #1. In that email, Co-Conspirator #2 informed LEISSNER that he had met with Co-Conspirator #1 and a high-

ranking official at 1MDB and learned that "1MDB plan[ned] to raise US$1.5bn on clean basis." Co-Conspirator #2 explained that he was "[g]earing this up to" a meeting with a high-ranking executive of U.S. Financial Institution #1.

29.    In approximately November 2009, there were public news reports about Co-Conspirator #1's activities in the United States.   Based on my review of emails obtained through the course of this investigation, I am aware that on or about November 9, 2009, LEISSNER and Co-Conspirator #2 received one such article from another banker at U.S. Financial Institution #1, which attached a New York Post article focused on Co-Conspirator #1's significant spending at New York City clubs, in which Co-Conspirator #1 was referred to as a lavish spender, stating, "when The Post interviewed Malaysian experts at such think tank [sic] as the Council on Foreign Relations, no one had ever heard of [Co-Conspirator #1] . . . . Speculation is brewing over where [Co-Conspirator #1] is getting his money from."

30.    Despite these early red flags regarding Co-Conspirator #1's suitability as a business partner, LEISSNER and Co-Conspirator #2 continued to work with Co-Conspirator #1 in pursuit of business for, and on behalf of, U.S. Financial Institution #1.

31.    For example, based on my review of emails and documents, I have learned that, on or about November 22, 2009, LEISSNER and Co-Conspirator #2 helped arrange a meeting between a high-ranking executive of U.S. Financial Institution #1 and Malaysian Official #1 in New York, New York.   Co-Conspirator #1 helped arrange this meeting and evidence supports that Co-Conspirator #1 was present.   In an email to LEISSNER, Co-Conspirator #2, and officers of 1MDB dated on or about November 22, 2009, Co-Conspirator #1 instructed the group as to how to arrange the meeting room in New York and the agenda, which

included a "debrief" with Malaysian Official #1 and the "1mdb boys" after U.S. Financial Institution #1 executives had left.

32.     In or about late 2009, U.S. Financial Institution #1 advised a special purpose vehicle ("SPV") that included 1MDB on a project referred to as "Project Sunfish." To advance that transaction, LEISSNER again relied on Co-Conspirator #1's connection to Malaysian Official #1.  Based on my review of emails, I have learned that during the project, Co-Conspirator #1 advised 1MDB and Malaysian Official #1, and this was known to both LEISSNER and Co-Conspirator #2.  For example, on or about March 26, 2010, Co-Conspirator #2 notified LEISSNER and another banker that Co-Conspirator #1 "pinged" him and discussed arranging a lunch meeting.  In that email, Co-Conspirator #2 noted that Co-Conspirator #1 was "close to [Malaysian Official #1]," and in a follow-up email, Co-Conspirator #2 underscored that Co-Conspirator #1's involvement in Project Sunfish "would be helpful . . . especially with [Malaysian Official #1]."

33.     I am further aware that, early on in the project, Co-Conspirator #1 specifically asked to conceal his involvement.  For example, after Co-Conspirator #2 sent a status update for Project Sunfish by email to senior 1MDB officials and Co-Conspirator #1, Co-Conspirator #1 responded separately, instructing Co-Conspirator #2 that when "e-mailing the 1mdb guys," he should "bcc" Co-Conspirator #1.  Based on my training and experience, I understand "bcc" to be a reference to the practice of "blind carbon copying" someone on an email so his or her name will not appear on the message when viewed by other recipients of the email.

34.     During this same period, in approximately 2010, emails and other documents received from U.S. Financial Institution #1 show that LEISSNER and Co-Conspirator

#2 continued to work with Co-Conspirator #1 to ingratiate themselves with the family of

Malaysian Official #1. For example:

        a.     On or about April 7, 2010, Co-Conspirator #1 emailed Co-

Conspirator #2 to request his assistance in securing the appearance of a former high-ranking

political official of the United States at an event in New York to honor the wife of Malaysian

Official #1 and her work as Chairperson of a Malaysian charity organization. Co-Conspirator

#2 forwarded the request to LEISSNER, who forwarded it to a high-ranking executive of U.S.

Financial Institution #1.

        b.     Between approximately April 2010 and September 2010, LEISSNER, Co-

Conspirator #1, and Co-Conspirator #2 communicated about making a donation of over

$300,000 to the same Malaysian charity headed by the wife of Malaysian Official #1 through

U.S. Financial Institution #1's charitable giving program. When the funds were not

forthcoming from U.S. Financial Institution #1, Co-Conspirator #2 emailed Co-Conspirator #1

at his personal email address, copying LEISSNER, stating, "[i]f urgent Tim can extend his

personal cheque. Will be guided by you." As delays in payment continued, Co-Conspirator

#2 emailed LEISSNER that Co-Conspirator #1 had texted him: "Fuming for R is serious." Co-

Conspirator #2 also emailed that "[s]he's not happy its [sic] taken so long and is questioning our

sincerity" and that the "Government [of Malaysia] maybe [sic] doing a sovereign." Based on

what I have learned during the course of the investigation, I believe that "R" refers to the wife

of Malaysian Official #1 and the reference to "a sovereign" means that the Government of

Malaysia might be doing a deal related to a sovereign wealth fund. Co-Conspirator #2 later

emailed Co-Conspirator #1 at his personal email address that U.S. Financial Institution #1 was

on "the last few hurdle[s]" in providing the donation, but that "[LEISSNER was] there if you

need to catch up and have him explain to the Madam." Again, I believe that "Madam" in this

case refers to the wife of Malaysian Official #1.

E.    LEISSNER and Co-Conspirator #2 Supported Co-Conspirator #1's Unsuccessful
      Attempts to Become a Formal Client of U.S. Financial Institution #1

35.    Based on my review of emails and documents obtained from U.S.

Financial Institution #1, and the interviews of current and former employees of U.S. Financial

Institution #1, among other sources of evidence, I know that between approximately September

2009 and March 2011, LEISSNER and Co-Conspirator #2 supported at least three attempts to

onboard Co-Conspirator #1 as a formal client of U.S. Financial Institution #1.   These attempts

were unsuccessful and included the following:

a.    In approximately September 2009, Co-Conspirator #2 referred Co-

Conspirator #1 for a private wealth management ("PWM") account with U.S. Financial

Institution #1's Swiss office.   In an email copying LEISSNER, Co-Conspirator #2 told a PWM

banker at U.S. Financial Institution #1 that Co-Conspirator #1 was "currently our partner in a lot

of transactions in [M]alaysia.   Largely the mid-east and [M]alaysia rationship [sic]."   As part of

the client onboarding process, compliance personnel reviewed Co-Conspirator #1's finances and

raised questions about the lack of information regarding his source of wealth.   Throughout the

process, LEISSNER and Co-Conspirator #2 were consulted about Co-Conspirator #1's

application and supported it.   Ultimately, U.S. Financial Institution #1's Compliance Group

refused to approve Co-Conspirator #1's application based, in part, on questions concerning his

source of wealth and negative news coverage of his lavish spending.

b.    Between approximately January and March 2011, LEISSNER

engaged with Co-Conspirator #1 concerning a project known as "Project Gold," in which a

private equity ("PE") firm controlled by Co-Conspirator #1 ("Foreign PE Firm #1"), a firm the

identity of which is known to the affiant, sought to acquire the assets of a private gold mining

company in Kazakhstan.   Based on my review of emails, among other sources of evidence, I

know the following occurred during that transaction:

             i.      U.S. Financial Institution #1 performed an Intelligence

Group check on the deal in which it reviewed the entities and persons involved in the transaction.

Upon learning that Foreign PE Firm #1 was an entity controlled by Co-Conspirator #1, personnel

from the Intelligence Group expressed concern about the bank advising on the transaction in an

email received by LEISSNER.

             ii.      Following the negative response from the Intelligence

Group, the deal team informed the Intelligence Group that the bank would instead advise a

different PE firm ("Foreign PE Firm #2"), a firm the identity of which is known to the affiant,

rather than Foreign PE Firm #1 on the transaction.   Notably, however, Foreign PE Firm #2 was

still an entity controlled by Co-Conspirator #1.   The change did not solve the problem as the

Intelligence Group remained concerned, with the head of the Intelligence Group in Asia finding

it "even more problematic."

             iii.      A senior employee within U.S. Financial Institution #1's

conflicts function also discussed the matter with LEISSNER, and recommended against

completing the transaction.

             c.      In approximately March 2011—less than a month after LEISSNER

was told by compliance personnel that U.S. Financial Institution #1 was against moving forward

with Project Gold due to Co-Conspirator #1's involvement—LEISSNER referred Co-

Conspirator #1 for another PWM account at U.S. Financial Institution #1, this time with the

bank's Singapore office.   U.S. Financial Institution #1 initiated a "high priority" background

check for Co-Conspirator #1.  Co-Conspirator #1 was again denied.  In connection with this second attempt, a compliance employee wrote, in reference to Co-Conspirator #1, that "we have pretty much zero appetite for a relationship with this individual."  A compliance employee further explained to a PWM banker that Co-Conspirator #1 "was reviewed by both my EMEA [Europe, Middle East, and Africa] counterpart and [the Intelligence Group] team, and it was concluded that no business will be allowed due to significant adverse information and questionable source of wealth.  Please be informed that we do not recommend onboarding this client in PWM Singapore."

36.     Based on my review of emails, I know that on or about the day the negative recommendation above was sent, LEISSNER and Co-Conspirator #2 arranged a meeting with Co-Conspirator #1 and another employee of U.S. Financial Institution #1 who worked with PWM to give Co-Conspirator #1 "guidance" on going through the process of opening a PWM account with U.S. Financial Institution #1 in Singapore.  Though the PWM employee stated in his response to Co-Conspirator #2 and LEISSNER that he was aware that Co-Conspirator #1 was rejected by the Swiss PWM office, Co-Conspirator #2 urged the PWM employee to attend the meeting, saying, "[g]iven the various things we have with this client, we should try to make an attempt, if possible" to open an account for Co-Conspirator #1.

F.     LEISSNER and Co-Conspirator #2 Concealed Co-Conspirator #1's Involvement in the 1MDB Bond Offerings in 2012 and 2013 from U.S. Financial Institution #1

37.     Between approximately 2012 and 2013, LEISSNER and Co-Conspirator #2, together with others, including a team of bankers from U.S. Financial Institution #1, helped 1MDB raise more than $6 billion via three separate bond offerings.  During that same time period, U.S. Financial Institution #1 also advised 1MDB on certain other business, including 1MDB's purchase of power assets throughout Malaysia.  LEISSNER was the lead banker on the

1MDB deal teams, which included Co-Conspirator #2 for the two bond offerings in 2012. In connection with these transactions, U.S. Financial Institution #1 earned more than $600 million in fees and other revenue.

## PROJECT MAGNOLIA

38.     In approximately February 2012, 1MDB engaged U.S. Financial Institution #1 for advice regarding its anticipated purchase of a Malaysian energy company ("Malaysian Energy Company A"), a company the identity of which is known to the affiant, a project known internally as "Project Turin." By letter dated on or about March 19, 2012, and signed by LEISSNER, 1MDB formally made U.S. Financial Institution #1 the "sole bookrunner and arranger" for the $1.75 billion debt financing transaction designed, in part, to pay for the acquisition of Malaysian Energy Company A. This transaction was referred to internally at U.S. Financial Institution #1 as "Project Magnolia."

39.     Based on my review of emails obtained from U.S. Financial Institution #1 and pursuant to judicially-authorized search warrants, I have learned that, prior to U.S. Financial Institution #1's formal engagement, LEISSNER and Co-Conspirator #2 had been in communication with Co-Conspirator #1 and were aware that Co-Conspirator #1 was involved in the underlying transaction. More specifically, based on my review, I have learned the following, in sum and substance and in part:

a.      On or about January 21, 2012, a representative from Malaysian Energy Company A emailed LEISSNER at LEISSNER's personal email account. LEISSNER forwarded this email to Co-Conspirator #1 and Co-Conspirator #2 at their personal email accounts, and LEISSNER stated that he was going to "ask for more detail."

b.      On or about January 24, 2012, Co-Conspirator #1 arranged a meeting between LEISSNER, Co-Conspirator #2, and a high-ranking official at 1MDB. To

arrange the meeting, Co-Conspirator #1 contacted LEISSNER, Co-Conspirator #2, and the high-ranking 1MDB official at their personal email addresses, and stated, "Making an introduction to [LEISSNER] and [Co-Conspirator #2's] private e-mail accounts as discussed." Co-Conspirator #1 further instructed them to maintain his low profile, stating, "Please exclude me from the e-mail list going forward." Thereafter, LEISSNER and Co-Conspirator #2 worked with the high-ranking official of 1MDB on the potential purchase of Malaysian Energy Company A.

      40.    Based on my review of emails obtained from U.S. Financial Institution #1 and pursuant to judicially-authorized search warrants, I have also learned that, during U.S. Financial Institution #1's engagement on Project Magnolia, LEISSNER and Co-Conspirator #2 met with Co-Conspirator #1 on at least two occasions regarding the transaction. More specifically, based on my review, I have learned the following, in sum and substance and in part:

      a.    On or about March 5, 2012, LEISSNER traveled to Abu Dhabi with Co-Conspirator #1 to meet with Foreign Agency A regarding the potential debt financing to assist 1MDB in raising funds for the Malaysian Energy Company A acquisition. Co-Conspirator #1 arranged a meeting between LEISSNER and a high-ranking official of Foreign Agency A, during which LEISSNER delivered a letter from Malaysian Official #1.

      b.    On or about March 26, 2012, Co-Conspirator #1 and LEISSNER planned to meet in New York, New York, with Individual #1, an individual whose identity is known to the affiant, who was a high-ranking official of Foreign Company A, a company the identity of which is known to the affiant. Foreign Company A was the company from which 1MDB ultimately purchased Malaysian Energy Company A.[2] Co-Conspirator #1 and

---

[2]    Foreign Company A ultimately received equity warrants in 1MDB Energy Labuan, an entity described more fully in Paragraph 44, in connection with Project Magnolia.

LEISSNER communicated about this meeting through emails. Specifically, on or about March 24, 2012, LEISSNER emailed Co-Conspirator #1 that Individual #1 wanted to have dinner "on Monday" [March 26, 2012] in New York. Co-Conspirator #1 confirmed he would be available for the Monday dinner, but stated he would "leave u to strategize if appropriate." Travel records confirm that Co-Conspirator #1, Co-Conspirator #2, and LEISSNER were in New York, New York, on Monday, March 26, 2012.

      c.    On or about April 21, 2012, LEISSNER and Co-Conspirator #1 met for lunch with several bankers from the Singaporean branch of Foreign Financial Institution #1 at a restaurant in Singapore to discuss aspects of Project Magnolia.

      41.    Based on my review of emails, documents obtained in the course of this investigation, and interviews with, among others, current and former employees at U.S. Financial Institution #1, I know that, on or about March 8, 2012, U.S. Financial Institution #1 initiated a compliance review for Project Magnolia, which was conducted, at least in part, by the Intelligence Group. Further, as set forth more fully below, I have learned that LEISSNER and Co-Conspirator #2 concealed Co-Conspirator #1's involvement from U.S. Financial Institution #1 and others. In particular:

      a.    During a telephone call on or about March 12, 2012, LEISSNER told a senior member of the Intelligence Group in Asia that Co-Conspirator #1 was not involved in Project Magnolia.

      b.    On or about March 16, 2012, during an Asia Standards Committee meeting regarding Project Magnolia, when asked by a Committee member if Co-Conspirator #1 was involved in Project Magnolia, LEISSNER responded that Co-Conspirator #1 was not

involved in the deal.  Co-Conspirator #2 was also present during the meeting and did not correct LEISSNER's false statement.

        c.    On or about April 3, 2012, in response to questioning, LEISSNER falsely told a member of the Intelligence Group in London that Co-Conspirator #1 was not involved in Project Magnolia.

        d.    On or about April 4, 2012, during a firmwide Capital and Suitability Committee meeting regarding Project Magnolia, the Global Co-Head of the Intelligence Group questioned LEISSNER about his meeting with Co-Conspirator #1 and a high-ranking official of Foreign Agency A in Abu Dhabi, and LEISSNER denied Co-Conspirator #1 was present, but admitted that he had helped arrange the meeting.  LEISSNER did not tell the Committees that Co-Conspirator #1 was otherwise involved in Project Magnolia.

        e.    On or about April 4, 2012, the Global Co-Head of the Intelligence Group stated to LEISSNER that U.S. Financial Institution #1 had "no role on our side for [Co-Conspirator #1] and we should ask that any payments from any of [sic] participants to any intermediaries are declared and transparent."  LEISSNER acknowledged the instruction, but failed to raise Co-Conspirator #1's involvement in the deal.  Instead, LEISSNER, Co-Conspirator #2, and other members of the deal team informed the Intelligence Group that there were no finders or intermediaries involved in Project Magnolia.  This information was relayed to the firmwide Capital and Suitability Committees, which met on or about May 16, 2012, to approve Project Magnolia.

        42.    Based on my review of emails obtained pursuant to judicially-authorized search warrants, I have learned that during the months leading up to the issuance of the Magnolia bond, Co-Conspirator #1 enlisted 1MDB officers, including 1MDB Official #1, to assist him in

managing 1MDB business, including the purchase of Malaysian Energy Company A, with the promise of remuneration.

43.    For example, on or about March 9, 2012, 1MDB Official #1 emailed himself a "chat" he had with Co-Conspirator #1 from March 8, 2012, in which they discussed a Malaysian Energy Company A transaction related to 1MDB, among other things. In the same chat, Co-Conspirator #1 said: "Give u big present," when the Malaysian Energy Company A transaction was done. Based on information learned during this investigation, I believe that Co-Conspirator #1 and 1MDB Official #1 were referencing the Malaysian Energy Company A acquisition in this chat. Co-Conspirator #1 also advised 1MDB Official #1 in the chat to "Pls delete from email and destroy once done."

44.    On or about May 21, 2012, Project Magnolia closed. The offering circular indicated that 1MDB Energy Limited (Labuan) ("1MDB Energy Labuan"), a subsidiary of 1MDB, issued $1.75 billion in privately-placed notes. Approximately $810 million of the proceeds was designated in the offering circular for use in acquiring Malaysian Energy Company A. The remainder—approximately $744 million—was designated for "general corporate purposes (which may include future acquisitions)."

45.    Based on my review of financial records obtained through the course of this investigation, I have learned that when U.S. Financial Institution #1 sent the proceeds of the Magnolia bond offering to 1MDB Energy Labuan, from a place within the United States to and through a place outside of the United States, nearly $577 million—a sum equivalent to more than one third of the net proceeds of the bond offering—was diverted to the bank account of Shell

Company #1 (the "Shell Company #1 Account"). As explained above, Shell Company #1 was not associated with the real Abu Dhabi investment firm, Foreign Investment Firm A.[3]

46.    On or about May 25, 2012, approximately $295 million was wire transferred from the Shell Company #1 Account to a Singapore bank account in the name of a purported real estate company ("Shell Account #2"). Based upon information learned during the course of this investigation, I do not believe this company bears any relation to the similarly-named investment funds of a widely known real estate investment firm ("Investment Firm B"). The recorded beneficial owner of Shell Account #2 was Individual #2, an individual whose identity is known to the affiant. Individual #2 is a Malaysian national and associate of Co-Conspirator #1. From my review of evidence obtained during the course of this investigation, I know that that Co-Conspirator #1 used Individual #2 as a proxy for financial transactions and directed him to transfer funds for Co-Conspirator #1. The evidence further shows that Co-Conspirator #1 had control over Shell Account #2.

47.    Approximately two weeks after the bonds were issued, on or about June 11, 2012, approximately $35 million was transferred from Shell Account #2 to a Hong Kong bank account in the name of Holding Company #1 ("Holding Company #1 Account"), a company whose identity is known to the affiant. Based on my review of financial records and documents obtained through the course of the investigation, I know that the Holding Company #1 Account was controlled by LEISSNER and his close relative. Also based on my review of documents obtained through the course of this investigation, I know that Holding Company #1 was a BVI-incorporated entity that was owned by LEISSNER's close relative.

---

[3]    A review of correspondent banking records related to this transfer reveals that the wires used to settle the transfer of this money from 1MDB Energy Labuan's account to the Shell Company #1 Account travelled through the Eastern District of New York.

48.    Financial records obtained through the course of the investigation show that the Holding Company #1 Account also received a transfer of approximately $16.9 million from Shell Account #2 on or about July 9, 2012.

49.    Other bond funds transferred to Shell Account #2 from Shell Company #1 Account were distributed to officials of Foreign Agency A, Foreign Investment Firm A, and 1MDB, including to "foreign officials" under the FCPA and for the benefit of Co-Conspirator #1 and others.

## PROJECT MAXIMUS

50.    Based on my review of emails, I have learned that on or about May 31, 2012, LEISSNER informed a colleague at U.S. Financial Institution #1 that 1MDB planned to purchase power assets from a Malaysian energy company ("Malaysian Energy Company B"), a company the identity of which is known to the affiant, and that it had retained U.S. Financial Institution #1 as an adviser on this transaction.    LEISSNER further explained that he expected this advisory role to result in a second bond deal with 1MDB.    Thereafter, U.S. Financial Institution #1 sought and won the mandate to act as arranger for 1MDB on this second bond transaction, known internally as "Project Maximus," which was also designed to raise approximately $1.75 billion for 1MDB, and resulted in substantial revenues and other fees for U.S. Financial Institution #1.

51.    Based on my review of documents and emails, and interviews with, among others, current and former employees of U.S. Financial Institution #1, I have learned that, as with Project Magnolia, LEISSNER and Co-Conspirator #2 concealed Co-Conspirator #1's involvement in the transaction from compliance personnel at U.S. Financial Institution #1.    In particular, between approximately June 14, 2012 and June 20, 2012, compliance personnel twice asked LEISSNER and other members of the deal team whether any finders were involved in the

deal, and LEISSNER and the rest of the deal team falsely advised that there were none. In one exchange, a compliance employee asked individuals on the deal team, "Is [Co-Conspirator #1] involve[d] in this transaction? Please also keep us posted if there are any other politically exposed person[s] involve[d] in this transaction in a non-official capacity." In response, an Executive Director on LEISSNER's team denied Co-Conspirator #1's involvement.

52.    My review of emails obtained through the course of this investigation has shown that during the same time that the deal team was denying any involvement by Co-Conspirator #1 in Project Maximus to compliance personnel, LEISSNER continued communicating with Co-Conspirator #1 about 1MDB business. Specifically, on or about June 15, 2012, Co-Conspirator #1 emailed LEISSNER, 1MDB Official #1, and a high-ranking 1MDB official at their personal email addresses a "Financial Plan—Key Points to Adhere to for [U.S. Financial Institution #1]," that laid out a multi-year plan for 1MDB business including, among other things, plans to "acquire more Energy companies in Malaysia" with financing to be "raised based on strength of target acquisitions." Co-Conspirator #1 stated, "PLEASE HAVE [U.S. FINANCIAL INSTITUTION #1] STATE THE FOLLOWING AND FOLLOW THE FOLLOWINGS [sic] IN FINANCIAL GUIDELINES," to which LEISSNER responded, "[w]ill included [sic] all these points!" On or about June 18, 2012, a member of the deal team at U.S. Financial Institution #1 sent a high-ranking official at 1MDB an email that included a presentation from U.S. Financial Institution #1 for 1MDB's Board of Directors containing many of the points outlined by Co-Conspirator #1 above. LEISSNER and Co-Conspirator #2 were copied on this email.

53.    Based on my review of documents obtained in the course of the investigation, and interviews with various personnel at U.S. Financial Institution #1, I have

learned that, on or about October 10, 2012, at a firmwide Capital Committee meeting, LEISSNER again told the Committee affirmatively that neither Co-Conspirator #1 nor any intermediary was involved in Project Maximus.   The Committee thereafter approved the bond transaction.

54.    My review of emails obtained through the course of this investigation has shown that LEISSNER continued communicating with Co-Conspirator #1 about 1MDB business during this time.   For example, on or about October 5, 2012, 1MDB Official #5 used a personal email account to email Co-Conspirator #1 at a personal email address, and copied LEISSNER at his personal email address.   The subject of the email was "Presentation for Executive Council," which I believe to be related to Project Maximus.   LEISSNER responded to 1MDB Official #5, "You are amazing!   A perfect paper in the middle of the night!   The only thing I would have added was the benefit of the new structure of [Foreign Agency A] guaranteeing the SPV is that it is [sic] allows for a greater degree of confidentiality as the bonds and the guarantee are separated."   Later emails from that same day show that U.S. Financial Institution #1 was negotiating with Foreign Agency A regarding Foreign Agency A's indirect guarantee of the Project Maximus bonds.

55.    Project Maximus closed on or about October 17, 2012, raising approximately $1.75 billion for 1MDB's wholly-owned subsidiary, 1MDB Energy (Langat) Limited ("1MDB Energy"), and resulting in substantial revenues and other fees for U.S. Financial Institution #1.   As stated in the offering circular, 1MDB Energy intended to use approximately $692,357,349 of the approximately $1,636,260,000 in net proceeds for the purchase of the power assets from Malaysian Energy Company B, and it intended to use the balance of the proceeds "for general corporate purposes (which may include future acquisitions)."

56.      Based on my review of financial records obtained through the course of this investigation, I have learned that, on or about October 19, 2012, two days after Project Maximus closed, approximately $790 million of the proceeds of the bond—a sum equivalent to approximately half of the net proceeds of the Project Maximus bond offering—was diverted to the Shell Company #1 Account on or about the same day that 1MDB Energy received the proceeds of this bond sale.[4]   The $790 million in proceeds from the bond offering was transferred to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States.

57.      Some of the proceeds that were transferred to the Shell Company #1 Account shortly after the bond issuance were transferred to the Shell Account #2.   For instance, financial records obtained through the course of this investigation show that:

a.      On or about October 23, 2012, approximately $75 million was wired from the Shell Company #1 Account to Shell Account #2.

b.      On or about November 23, 2012, approximately $95 million was wired from the Shell Company #1 Account to Shell Account #2.

c.      On or about December 14, 2012, approximately $39 million was wired from the Shell Company #1 Account to Shell Account #2.

### Use of the Illicit Proceeds

58.      Based on my review of financial records, emails, interviews with employees of Foreign Financial Institution #1, and other documents obtained through the course of this investigation, I have learned that, as with the funds diverted from Project Magnolia, bond

---

[4]    A review of correspondent banking records related to this transfer reveals that the wires used to settle the transfer of this money from 1MDB Energy's account to the Shell Company #1 Account travelled through the Eastern District of New York.

funds from Project Maximus that were transferred to Shell Account #2 were distributed to various co-conspirators, including officials of Foreign Agency A, Foreign Investment Firm A, and 1MDB, including "foreign officials" under the FCPA. More specifically:

        a.     From in or around late October 2012 to in or around early November 2012, approximately $200 million was transferred from Shell Account #2, through several intermediary accounts, to an account beneficially owned by Co-Conspirator #1. Co-Conspirator #1 used these funds to, among other things, purchase jewelry, pay off credit card bills, and pay expenses related to a private jet. In addition, Co-Conspirator #1 transferred funds to other accounts beneficially owned or controlled by Co-Conspirator #1 or members of his immediate family.

        b.     Between in or around May 2012 and November 2012, approximately $472,750,000 was transferred from Shell Account #2 into a Luxembourg account controlled by a co-conspirator who used these funds to, among other things, purchase luxury property in New York and Beverly Hills, California.

        c.     Between in or around May and December 2012, approximately $66 million was transferred from Shell Account #2 into two different accounts beneficially owned by another co-conspirator and his then-wife.

        d.     Between in or around June and November 2012, approximately $238 million was transferred from the Shell Company #1 Account to a Singapore bank account belonging to an entity owned by a friend of Co-Conspirator #1 who was also a relative of Malaysian Official #1.

e.    On or about and between December 6, 2012 and December 19, 2012, as well as on or about January 21, 2013, a total of approximately $20 million was transferred from Shell Account #2 to the Holding Company #1 Account.

f.    On or about December 7, 2012, LEISSNER caused approximately $350,000 to be transferred from the Holding Company #1 Account to an account co-owned by 1MDB Official #4.

g.    On or about December 7, 2012, LEISSNER attempted to cause approximately $1 million to be transferred from the Holding Company #1 Account to the account of a company beneficially owned by 1MDB Official #3.[5]

h.    On or about December 20, 2012, LEISSNER additionally caused approximately $350,000 to be transferred from the Holding Company #1 Account to the account co-owned by 1MDB Official #4.

i.    On or about December 20, 2012, LEISSNER caused approximately $1 million to be transferred from the Holding Company #1 Account to the account of an entity that was beneficially owned by 1MDB Official #1.

59.    On or about February 22, 2013, the Shell Account #2 balance fell to zero.

PROJECT CATALYZE

60.    In or about November 2012, almost immediately after Project Maximus closed, LEISSNER and Co-Conspirator #1 began working on the next 1MDB bond deal, a proposed $3 billion bond issuance known at U.S. Financial Institution #1 as "Project Catalyze."[6] On or about January 15, 2013, following a pitch to 1MDB from the bankers, U.S. Financial

---

5    This transaction ultimately did not go through due to incorrect wire transmission information.

6    Co-Conspirator #2 was not a member of the deal team for Project Catalyze.

Institution #1 was engaged on the project and, as a result, secured substantial revenues and other fees.

61.     Based on my review of financial records, emails, and other documents obtained through the course of this investigation, I have learned that days after U.S. Financial Institution #1 was awarded its role in Project Catalyze, LEISSNER began causing the transfer of millions of dollars to accounts beneficially owned by 1MDB officials, including "foreign officials" under the FCPA, specifically:

a.      On or about January 17, 2013, LEISSNER caused the transfer of approximately $1 million from the Holding Company #1 Account to the bank account of an entity beneficially owned by 1MDB Official #2.

b.      On or about January 17, 2013, LEISSNER caused another transfer of approximately $1 million to the bank account of an entity beneficially owned by 1MDB Official #3.

62.     In approximately January 2013, as it had with the previous bond deals, the Intelligence Group began conducting due diligence on Project Catalyze.   The Intelligence Group's due diligence included focusing on whether there were any intermediaries, and, specifically, on whether Co-Conspirator #1 was involved in the transaction.   Despite knowing that Co-Conspirator #1 was involved in the deal and was liaising with 1MDB and other Malaysian government officials in relation to Project Catalyze, LEISSNER failed to disclose this fact to the Intelligence Group, the Compliance Group, or the Committees reviewing the transaction.   Nor did LEISSNER disclose that he had caused approximately $3.7 million to be paid into the accounts of four different 1MDB officials who were involved in the transaction.

63.    For example, based on my review of emails and documents obtained from
U.S. Financial Institution #1 and interviews with employees of U.S. Financial Institution #1,
among other sources of evidence, I have learned that on or about March 10, 2013, LEISSNER
attended a joint firmwide and Asia Pacific Capital and Suitability Committee meeting on Project
Catalyze.    At the meeting, LEISSNER was asked by the Committees whether Co-Conspirator #1
was involved in Project Catalyze, and LEISSNER falsely stated that he was not aware of any
involvement by Co-Conspirator #1.    LEISSNER also did not disclose to the Committees that he
had previously paid 1MDB officials, despite his knowledge that this violated the policies of U.S.
Financial Institution #1 and that he was required to disclose this information.

64.    The relevant firmwide Committees approved Project Catalyze on or about
March 13, 2013.    The third 1MDB bond issued on or about March 19, 2013.

65.    On or about April 24, 2013, a senior employee of U.S. Financial Institution
#1 and member of the firmwide Capital Committee located in New York, New York, emailed
LEISSNER about "1MDB," asking: "Is there a story circulating about an intermediary on the
Magnolia trades??"    LEISSNER responded, "Not that I am aware of . . .    There definitely was
no intermediary on any of the trades.    The blogs in Malaysia always try to link a young Chinese
business man, [Co-Conspirator #1], to 1MDB.    That is not the case other than he was an advisor
alongside other prominent figures to the King of Malaysia at the time of the creation of 1MDB."
Based on LEISSNER's knowledge at the time and the fact that LEISSNER continued to work
with Co-Conspirator #1 on the deals, this statement was false.

Use of Illicit Proceeds

66.    Based on my review of financial records, emails, and other documents
obtained through the course of this investigation, I have learned that thereafter, some of the

approximately $3 billion raised by the Catalyze bond issuance was transferred to LEISSNER, Co-Conspirator #1, and others. More specifically:

      a.     On or about July 3, 2013, approximately $65 million that can be traced to the Project Catalyze bond issuance was transferred from an account in the name of a purported private equity firm ("Shell Account #3"), another account controlled by Co-Conspirator #1, to LEISSNER at the Holding Company #1 Account. The $65 million was transferred to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States.

      b.     Previously, on or about March 21, 2013, approximately $681 million was transferred from an account in Switzerland in the name of a purported financial corporation for which Individual #2 and 1MDB Official #5 were the signatories ("Shell Account #4"), to an account in Malaysia belonging to Malaysian Official #1. On or about August 26, 2013, approximately $620 million was wired from a different account controlled by Malaysian Official #1 in Malaysia to Shell Account #4. A portion of these funds were then passed through various additional accounts controlled by Co-Conspirator #1 and Individual #2 and was ultimately used to purchase a 22-carat pink diamond pendant and necklace for the wife of Malaysian Official #1. The purchase price of approximately $27.3 million was paid to a jeweler ("Jeweler #1"), a person whose identity is known to the affiant, located in New York, New York, on or about September 10, 2013.

      c.     On or about June 4, 2013, approximately $58 million was transferred from Shell Account #4 to an account maintained in New York, New York, by an auction house ("Auction House #1"), a company the identity of which is known to the affiant, to acquire five pieces of valuable artwork for Co-Conspirator #1 and Individual #2. On or about

July 3, 2013 and September 9, 2013, additional transfers of approximately $7.9 million and $71 million respectively, were sent from Shell Account #4 to Auction House #1 to acquire additional artwork for Co-Conspirator #1 and Individual #2.

        d.      On or about July 19, 2013, LEISSNER caused approximately $6 million to be transferred from the Holding Company #1 Account to another bank account controlled by LEISSNER that was maintained in the name of a management company ("Management Company #1") (the "Management Company #1 Account"), a company the identity of which is known to the affiant. Based on my review of documents and emails obtained during the course of this investigation, I know that the management company is also a company owned by LEISSNER's close relative and that LEISSNER directed transfers from the Management Company #1 Account.

        G.      Other 1MDB Business with U.S. Financial Institution #1

        67.      Based on my review of emails and documents obtained from U.S. Financial Institution #1, and interviews of current and former employees of U.S. Financial Institution #1, I am aware that from in or about 2012 through the end of 2014, U.S. Financial Institution #1 sought, obtained, or worked to execute several additional transactions with 1MDB. These included the following:

        a.      In or about December 2012, U.S. Financial Institution #1 began internal due diligence to act as an adviser to 1MDB on the acquisition of a Malaysian energy company ("Malaysian Energy Company C"), a company the identity of which is known to the affiant, which was known internally as "Project Jedi."

        b.      In or about late 2012, U.S. Financial Institution #1 began exploring another bond issuance that would be guaranteed by Foreign Financial Institution #2, a financial

institution the identity of which is known to the affiant.   This project was known internally as "Project Sonic."

   c. On or about 2014, 1MDB sought a loan from several banks, including U.S. Financial Institution #1.   LEISSNER worked on this transaction, which was referred to internally as "Project Paladin."   However, the loan was not ultimately completed by U.S. Financial Institution #1, and was instead completed by Foreign Financial Institution #3, a financial institution the identity of which is known to the affiant.

   d. On or about January 13, 2014, 1MDB formally invited U.S. Financial Institution #1 to submit a proposal to provide services to 1MDB on a proposed IPO of 1MDB Energy, which was known internally as "Project Tribaldance."   U.S. Financial Institution #1 continued to work on the proposed IPO through 2014.   Emails from U.S. Financial Institution #1 show that one of the reasons why 1MDB Energy pursued a possible IPO was to resolve the equity warrants in 1MDB Energy Labuan held by Foreign Company A, which it had obtained in connection with Project Magnolia.

   68. Based on my review of financial records, emails, and other documents obtained through the course of this investigation, I have learned that throughout the time period of these post-Catalyze transactions, Co-Conspirator #1 and LEISSNER continued to make corrupt payments to 1MDB officials, including from the proceeds of Project Catalyze.   More specifically:

   a. On or about July 22, 2013, LEISSNER caused approximately $6 million to be transferred from the Management Company #1 Account to the bank account of an entity beneficially owned by 1MDB Official #5.

      b.      On or about July 29, 2013, LEISSNER also caused another approximately $1 million to be transferred from the Holding Company #1 Account to the bank account of an entity beneficially owned by 1MDB Official #2.

      c.      On or about the same date, LEISSNER caused approximately $1 million to be transferred from the Holding Company #1 Account to the account of an entity beneficially owned by 1MDB Official #3.

      d.      On or about September 11, 2013, approximately $1 million was transferred by check from Shell Account #3 to the account of an entity beneficially owned by 1MDB Official #1.

      69.      In addition, emails obtained in the course of this investigation also show that Co-Conspirator #1 continued to promise payments to 1MDB officials.   For example:

      a.      On or about June 7, 2013, 1MDB Official #1 again emailed himself a saved chat with Co-Conspirator #1, in which they discussed 1MDB business, including how to conceal the diversion of funds from the 2012 and 2013 1MDB bonds into the Shell Company #1 Account from auditors and bondholders.

      b.      In the same chat, Co-Conspirator #1 promised 1MDB Official #1 "[o]ne american [sic] burger shld [sic] be delivered next week."   Based on my experience, my review of evidence obtained in the course of this investigation, including other references to what I believe are corrupt payments as "cakes" discussed below, and the context of this exchange, I believe that the reference to the delivery of an "American burger" is likely a reference to the transfer of $1 million, which is consistent with the amount that 1MDB Official #1 was paid by LEISSNER on or about December 20, 2012, immediately following Project Maximus, and the amount transferred to 1MDB Official #1 from Shell Account #3 on or about September 11, 2013.

Furthermore, in the same chat, Co-Conspirator #1 told 1MDB Official #1: "Fyi, delete after reading," which is further evidence that they were discussing the payment of bribes.

70.    On or about September 25, 2013, LEISSNER and Co-Conspirator #1 met with a high-ranking executive at U.S. Financial Institution #1, Malaysian Official #1, a family member of Malaysian Official #1, 1MDB Official #5, and others in New York, New York, to discuss business opportunities for U.S. Financial Institution #1 in Malaysia, including with 1MDB.   The meeting took place at the Time Warner Center, and Malaysian Official #1 stayed at the Mandarin Oriental Hotel.

71.    Three days later, on or about September 28, 2013, Jeweler #1 met with Co-Conspirator #1 and the wife of Malaysian Official #1 in a hotel suite at the Mandarin Oriental Hotel in New York, New York, to show the wife of Malaysian Official #1 the pink diamond necklace discussed above in Paragraph 66(b) that Jeweler #1 had designed for her at Co-Conspirator #1's request.

72.    On or about June 2, 2014, LEISSNER sent an email to himself at his personal email account containing a chat between himself and Co-Conspirator #1 in which the two discussed 1MDB business opportunities that U.S. Financial Institution #1 was trying to win at the time, including the 1MDB Energy IPO.   Based on my review of the exchange, I have learned the following, in sum and substance and in part:

a.    LEISSNER stated: "Don't forget. The [Foreign Company A] warrants. We need to sort that out asap too," to which Co-Conspirator #1 responded, "Okay." Based on my review of emails and documents, and the context of these statements, I believe that LEISSNER was referring to one aspect of Project Tribaldance, which, as discussed above, involved the 1MDB Energy Labuan warrants held by Foreign Company A.

b.      LEISSNER and Co-Conspirator #1 also discussed how to manage officials at 1MDB in order to steer business to U.S. Financial Institution #1.  For example, Co-Conspirator #1 stated that a high-ranking 1MDB official and 1MDB Official #2 were unhappy with U.S. Financial Institution #1 for not "deliver[ing]" the loan to 1MDB in Project Paladin, which ultimately was provided by Foreign Financial Institution #3.  As a result, according to Co-Conspirator #1, 1MDB would only give U.S. Financial Institution #1 a more limited role in the 1MDB Energy IPO.  LEISSNER responded that he "would have delivered," and expressed frustration that U.S. Financial Institution #1 was concerned about issues related to 1MDB's delayed financial reporting at that time, declaring "Committee is stupid!!!"

c.      LEISSNER and Co-Conspirator #1 then agreed that LEISSNER would "babysit" the high-ranking 1MDB official and 1MDB Official #2, and Co-Conspirator #1 would "manage via [1MDB Board of Directors]."  LEISSNER also noted that the high-ranking 1MDB official and 1MDB Official #2 did not provide "much of value" but that they "need[ed] to suck up to them."

d.      LEISSNER and Co-Conspirator #1 also discussed sending "cakes" to "madam boss," and Co-Conspirator #1 asked if he could transfer money into the Management Company #1 Account so that LEISSNER could "settle madam cakes 2."  Co-Conspirator #1 also asked LEISSNER, "Do u mind if funds go [Shell Company #1] to u direct at [Management Company #1][7]?  Or u think too sensitive?"  LEISSNER responded, "[Shell Company #1] is ok too.  But need to get it out asap.  Best today.  Because I am seriously in trouble."  From my training and experience, and information learned in the course of this investigation, I believe that

---

[7]      Co-Conspirator #1 used a misspelling of Management Company #1's name.

"cakes" is a reference to money or bribes, and "madam boss" refers to the wife of Malaysian Official #1.

       e.      LEISSNER and Co-Conspirator #1 discussed LEISSNER's continued efforts to onboard Co-Conspirator #1 as a formal client of U.S. Financial Institution #1. LEISSNER explained that he would "push harder" for Co-Conspirator #1 once LEISSNER was confirmed as U.S. Financial Institution #1's Southeast Asia Chairman of IBD.

      73.     Based on my review of emails and financial records, I believe that, on or about the date of the exchange detailed above, approximately $1.215 million was transferred from the Shell Account #3 to the Management Company #1 Account. However, in the June 2, 2014 chat, Co-Conspirator #1 stated that he had directed Individual #2 to transfer $12.15 million to LEISSNER. LEISSNER and Co-Conspirator #1 discussed the deviation in their chat, and Co-Conspirator #1 promised to correct it.[8]

      74.     On or about October 10, 2014, LEISSNER caused approximately $4.1 million to be transferred from the Management Company #1 Account to Jeweler #1 in New York, New York, in part to pay for approximately $1.3 million in jewelry that had been purchased on or about January 3, 2014 by the wife of Malaysian Official #1 while she, Co-Conspirator #1, and Malaysian Official #1 were in the United States.

---

[8]    On or about July 8, 2014, the balance of the Management Company #1 Account fell to zero. On or about October 7, 2014, approximately $39.75 million was transferred into the Management Company #1 Account from another account controlled by Co-Conspirator #1 and other co-conspirators.

WHEREFORE, your deponent respectfully requests that the defendant TIM

LEISSNER be dealt with according to law.

Because public filing of this document could result in a risk of flight by the

defendant TIM LEISSNER, as well as jeopardize the government's ongoing investigation, your

deponent respectfully requests that this complaint, as well as any arrest warrant issued in

connection with this complaint, be filed under seal.


JUSTIN MCNAIR
Special Agent, Federal Bureau of Investigation

Sworn to before me this
7th day of June, 2018

S/ Gold

_____
THE HONOR
UNITED STA
EASTERN DIS