

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AES/DGR/DAS
F. #2016R00467

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 15, 2025

The Honorable Margo K. Brodie
Chief United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Tim Leissner
                Criminal Docket No. 18-439 (MKB)

Dear Chief Judge Brodie:

        The government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), to apprise the Court of the substantial assistance provided by the defendant Tim Leissner and permit the Court, in its discretion, to impose a sentence below the otherwise applicable advisory Guidelines range. The defendant is scheduled to be sentenced by the Court on May 29, 2025.

        As set out below, Leissner agreed to cooperate against those responsible for one of the largest financial crimes in history. It was a globe-spanning scheme that involved the diversion of billions of dollars that were supposed to benefit the people of Malaysia; brazen corruption at the highest levels of government in multiple countries; and the use of the world's most successful investment bank to advance these crimes. Leissner's years' long cooperation with the government's investigation of the sprawling fraud related to 1Malaysia Development Berhad ("1MDB") was extraordinary. Long before his trial testimony publicly described the scheme and his central role in it, Leissner's cooperation gave the government a vast array of evidence that only someone in Leissner's position could. Throughout, Leissner was clear about his significant criminal conduct, the greed that fueled it, and the tremendous harm it caused.

        For nearly seven years, Leissner has continued to cooperate. As is required of all cooperating witnesses, Leissner never shrunk from his responsibility of total candor—he spoke openly about his crimes, his past, and his personal life and continued to do so as both the 1MDB criminal scheme and his personal life took center stage in court and in public.

Given Leissner's extensive and extraordinary cooperation, and assuming he fully complies with the terms of his cooperation agreement ahead of sentencing, the government will move, at sentencing, under Section 5K1.1.

I.  Factual Background and Criminal Conduct

A.  Overview

1MDB was a strategic investment and development company wholly owned and controlled by the government of Malaysia. The International Petroleum Investment Company ("IPIC") was a sovereign wealth fund wholly owned by the government of Abu Dhabi. In 2012 and 2013, 1MDB engaged in three bond transactions (the "1MDB Bond Transactions"), which collectively raised more than $6 billion for 1MDB. The 1MDB Bond Transactions were either directly or indirectly guaranteed by IPIC. The purpose of the funds raised by the 1MDB Bond Transactions was to support energy- and infrastructure-related projects that would benefit the Malaysian people.

The Goldman Sachs Group, Inc. ("Goldman Sachs") and its subsidiaries and affiliates (collectively, "Goldman") facilitated the 1MDB Bond Transactions. Leissner worked as an investment banker at Goldman from 1998 to 2016, and was a member of its select group of bankers (approximately the top 1% of the firm) chosen to be Principal Managing Directors. Prior to his separation from Goldman in February 2016, he was the Southeast Asia Chairman and Managing Director for Goldman's Investment Banking Division. Among the clients Leissner "covered" for Goldman in Southeast Asia was 1MDB's predecessor entity, the Terengganu Investment Authority ("TIA"). In 2009, through that work with TIA, Leissner met Low Taek Jho, also known as "Jho Low", a Malaysian financier introduced to him by Leissner's colleague at Goldman, Ng Chong Hwa, also known as "Roger Ng."

Soon after meeting Low, both Leissner and Ng began a years' long effort to leverage Low's relationships with senior government officials in Malaysia and Abu Dhabi to win business for Goldman, including from 1MDB. They also repeatedly tried, without success, to secure a Goldman private wealth account for Low, assuming it would help them in their pursuit of business with Low. Those efforts were repeatedly stymied by Goldman compliance personnel troubled by Low's opaque finances and ties to government officials in high-risk regions. Undeterred, Leissner and Ng continued cultivating a relationship with Low in the hopes of securing lucrative business. In 2012 and 2013, they succeeded.

B.  1MDB Bond Transactions

Leissner, Ng, and Low became core members of a criminal scheme related to the 1MDB Bond Transactions. As part of that scheme, Leissner agreed with others, including Ng and Low, to pay bribes to foreign officials in Malaysia and Abu Dhabi, including officials at 1MDB and IPIC. In exchange for these corrupt payments, the 1MDB officials agreed to hire Goldman to orchestrate the 1MDB Bond Transactions. For its work on the 1MDB Bond Transactions, Goldman ultimately earned more than $600 million in fees and revenue. In total, Ng, Leissner and Low conspired for billions of dollars that were raised through the 1MDB Bond Transactions to be laundered into accounts that Low personally controlled. From there, approximately $2 billion in bribes were paid to officials at 1MDB and IPIC, and other

governments officials in Malaysia and Abu Dhabi, and more than $1 billion in kickbacks were paid to Ng, Leissner, Low and others involved in the scheme.

To execute the scheme, Ng, Leissner and others at Goldman affirmatively lied to and failed to disclose information to multiple Goldman committees responsible for authorizing the 1MDB Bond Transactions. Specifically, Ng, Leissner and others concealed from Goldman that Low was the ultimate decisionmaker behind the 1MDB Bond Transactions and an individual with whom they had been secretly working for years to win Goldman business. In addition, Ng and Leissner also concealed from Goldman's committees that (1) corrupt payments would be made to government officials in Malaysia and Abu Dhabi in order to complete the 1MDB Bond Transactions, (2) funds raised from the 1MDB Bond Transactions would be diverted from 1MDB to make the corrupt payments as part of the scheme, and (3) Ng and Leissner would personally receive kickbacks from the 1MDB Bond Transactions.

In the first of the three 1MDB Bond Transactions, called "Project Magnolia" within Goldman Sachs, Goldman helped 1MDB raise approximately $1.5 billion to, among other things, facilitate 1MDB's purchase of certain Malaysian energy assets. In advance of the transaction, Ng, Leissner, and Low agreed to make a series of corrupt payments to government officials in Malaysia and Abu Dhabi to ensure that the deal would be consummated and to enrich themselves and Goldman. Ultimately, the funds to make those corrupt payments were taken from the funds raised by Goldman for Project Magnolia, as well as from funds raised in the two subsequent bond transactions.

Leissner and Ng were central to executing this transaction and the bribery scheme. Leissner was present for each of the most sensitive meetings with Low and others concerning the deals. Through those meetings, Leissner and Ng were specifically informed about the need to bribe government officials in two countries to execute the transactions. Leissner was the most senior coverage banker at Goldman working these transactions and, as such, communicated directly with Goldman's leadership teams and committees reviewing the transaction. Through that process, multiple questions were raised concerning Low's possible involvement, and Leissner lied repeatedly to avoid revealing Low's central role in the transactions. Notwithstanding the denials made to Goldman officials reviewing the deals, multiple members of the deal team were aware of Low's involvement and concealed those facts.

On May 21, 2012, Project Magnolia was finalized, and Goldman wired $907.5 million to a bank account controlled by a 1MDB subsidiary. Thereafter, using multiple shell companies designed to obscure the true nature of the entity and the origin of the proceeds it received, more than $400 million was siphoned from the original bond proceeds into accounts that Low controlled. Initially, Ng and Leissner expected to receive their kickbacks shortly after the closing. But when there was some delay in receipt, Leissner suggested using one of his "entities" in Hong Kong as a conduit to make payments. The entity would be a shell company owned, on paper, by Leissner's wife, but to which Leissner had access and control to move funds (the "Capital Place Account"). The day before Project Magnolia closed, on May 20, 2012, Leissner sent an email from his personal Yahoo account asking his then-wife for the account details for the Capital Place Account. He wrote, "[b]est if they are US$ accounts. We should also tell the bank that we will receive a transfer." On June 11, 2012 and July 9, 2012, the Capital Place Account received $35 million and $16.96 million, respectively, from an account controlled by Low, which funds were traceable to the bond proceeds. Ng, GX-151.

3

Shortly after Project Magnolia concluded, Low told Ng and Leissner that "the scheme had worked well" and that "there was more money to be made in a similar scheme." Subsequently, Leissner and his co-conspirators completed two additional bond transactions in furtherance of the bribery conspiracy. First, five months after the closing of Project Magnolia, Goldman underwrote another 1MDB bond transaction, called "Project Maximus" within Goldman. This transaction purported to facilitate 1MDB's investment in domestic energy projects, including the purchase of assets from another Malaysian energy company. Leissner and Ng again worked on the deal team and continued to surreptitiously communicate with Low concerning the transaction.

After the transaction closed, more than $600 million was diverted from the bond proceeds and into accounts controlled by Low. Because not all of the government officials involved in Project Magnolia were paid through the first round of bribe payments, Low asked Leissner to make payments to the not-yet-paid officials from the Capital Place Account they had used to wire money after Project Magnolia. Leissner agreed to assist, and, thereafter, approximately $20.5 million of bond proceeds was wired to the Capital Place Account. Leissner, at Low's direction, then wired a total of approximately $3.7 million to the bank accounts of shell companies controlled by participants in the scheme. Although Leissner did not know the identities of the shell company owners, he understood them to be government officials who were assisting with the scheme. Ng, GX-152.

In March 2013, the defendants continued the scheme through a third 1MDB bond transaction underwritten by Goldman, called "Project Catalyze" within Goldman. After Project Catalyze closed, more than $1 billion was diverted from the bond proceeds and used to pay bribes and kickbacks. Hundreds of millions were sent to accounts Low controlled and used to buy art, real estate and other luxury items. Millions more were routed to close relatives of the Malaysian Prime Minister, including money used to produce the movie "Wolf of Wall Street." Additional corrupt payments were made to Leissner and Ng. Ng, GX-153.

\* \* \* \* \*

In total, as a result of the bribery and money laundering scheme related to the 1MDB Bond Transactions, at least a dozen foreign officials in Malaysia and Abu Dhabi received more than $2 billion in bribe payments, all of which were traceable to the funds raised in the 1MDB Bond Transactions. At trial, the government offered proof of the following approximate total bribe amounts:

## Total Traced Funds from 1MDB Bond Deals

| Individual(s) Related to Account(s) | Affiliation of Individual | Related Account(s) | Approximate Total |
|---|---|---|---|
| Roger Ng, Wife of Ng, Mother-in-Law of Ng | Goldman Sachs | Silken Waters / Victoria Square Account, River Blue Account, TKC UBS Account, LHB/TKC OCBC Singapore Account, LHB/TKC OCBC Malaysia Account, TKC DB Account | $35.1 million |
| Tim Leissner, Wife of Leissner | Goldman Sachs | Capital Place Account, World Merit Account, Judy Leissner MS Account, Judy Leissner Citi Account | $73.4 million* |
| Jho Low, Associates of Jho Low | Malaysia and Abu Dhabi | Aabar PJS Limited (BVI) Account, Blackstone Account Alsen Chance Account, Tanore Account, Blackrock Communities Account, Affinity Equity Account | $1.42 billion* |
| Prime Minister Najib Razak | Government of Malaysia | Najib Amprivate Banking-MR Account | $756 million |
| Jasmine Loo | Government of Malaysia / 1MDB | Heartland Global Account, River Dee Account, Springbrook Account | $12.6 million |
| Terence Geh | Government of Malaysia / 1MDB | Pure Precision Account | $2 million |
| Vincent Koh | Government of Malaysia / 1MDB | Everglades Account | $2 million |
| Jerome Lee, Wife of Lee | Government of Malaysia / 1MDB | Jerome Lee / Koay Ying Ying Account | $1.7 million |
| Nurzahid Taib | Government of Malaysia / 1MDB | Turquoise Coast Account | $2 million |
| Yan Yahaya | Government of Malaysia / Advisor to PM Razak | Spring Elite Account | $4.9 million |
| Amhari Nazaruddin | Government of Malaysia / Advisor to PM Razak | Aerosphere Account | $895,000 |
| Azlin Alias | Government of Malaysia / Advisor to PM Razak | Derivale Account | $980,000 |
| Riza Aziz | Government of Malaysia / Stepson of PM Razak | Red Granite Capital Account, Red Granite Productions Account, Red Granite Pictures Account, TWOWS LLC Account | $238 million |
| Khadem Al-Qubaisi | Government of Abu Dhabi / IPIC | Aabar PJS Limited (BVI) Account, Vasco Investment Account | $472.75 million |
| Mohamed Al-Husseiny, Wife of Husseiny | Government of Abu Dhabi / Aabar | Aabar PJS Limited (BVI) Account, Rayan Inc. Account, MB Consulting Account | $76.6 million |
| Yousef Al Otaiba, Co-Owners with Otaiba | Government of the United Arab Emirates | Silver Coast Account, Densmore Account | $40 million |

*Estimated amounts retained in related accounts.     All amounts are approximate.



GOVERNMENT EXHIBIT
GX-157
18-CR-538 (S-2) (MKB)



Over the course of the scheme, Leissner played a central role, helping close the transactions within Goldman, moving diverted bond proceeds through shell companies he controlled at Low's direction, and profiting from the globe-spanning scheme. Throughout, Leissner conspired with his close relatives, including his then-wife who was the listed owner of the shell companies and accounts used to receive and send funds. Leissner also conspired to conceal his connection to the criminal proceeds from the 1MDB Bond Transactions using other shell companies. In total, Leissner received approximately $73.4 million as kickbacks and assisted in the transfer and laundering of hundreds of millions of dollars for Low in connection with the scheme.

Leissner used the proceeds from the 1MDB scheme to make substantial purchases and investments. In doing so, he used additional shell companies and close relatives to hide the true origin of the funds. A large portion of the funds were held in bank accounts in Leissner's ex-wife's name, where they were invested and generated returns for Leissner and his family. For example, Leissner used $9 million to purchase a stake in a professional Italian soccer team. Another large portion was used to purchase private stakes in startup companies in the United States, including a $3 million investment in an energy drink company.[1]

    C.    <u>Leissner's Subsequent Criminal Conduct with Low</u>

After Project Catalyze closed, Leissner continued his criminal relationship with Low. Leissner continued to move criminal proceeds from the bond transactions at Low's direction in the hopes that doing so would help him win business for Goldman, all while hiding his connection to Low from Goldman's compliance personnel. For example, Leissner was asking Low to help with an engagement on a potentially lucrative IPO of 1MDB Energy, and on or about October 7, 2014, Low transferred $39.75 million from a shell company he controlled to Leissner at one of Leissner's shell accounts (the "World Merit Account"), which funds were later traced back to a bridge loan that another financial institution had made to 1MDB subsequent to the 1MDB bond deals. The next day, Low informed a high-profile New York jeweler that World Merit would be transferring her $4.1 million, in part to pay for $1.3 million in gold necklaces and bracelets purchased for the wife of the Prime Minister of Malaysia, who had approval authority over 1MDB business. Three days later, Leissner transferred $4.1 million from the Hong Kong account of World Merit to the jeweler.

As another example, in June 2015, Leissner drafted a letter on Goldman letterhead to a private Luxembourg-based bank vouching for Low and his family, and indicating that Goldman had conducted due diligence, confirmed Low's wealth, and had found no AML risks. These statements were false and made without Goldman's consent. Goldman discovered the letter and its personnel confronted Leissner, who admitted to drafting it without authorization. Leissner was placed on leave and later resigned from Goldman before he could be terminated.

---

[1] As part of his guilty plea and cooperation agreement, Leissner agreed to forfeit all title and interest in that investment, which is now valued at over $300 million.

After leaving Goldman, Leissner stayed in close communication with Low concerning business deals and to coordinate the transfer of large amounts of money that Leissner understood were traceable to the 1MDB Bond Transactions. To effect certain of these transfers, Leissner created numerous shell companies that were nominally owned by his close relative but were actually controlled by Leissner. These included companies incorporated outside the United States, including in the Bahamas, Mauritius and other countries.

In early 2016, Leissner was subpoenaed in connection with the Federal Bureau of Investigation's ("FBI") ongoing investigation of the 1MDB bond deals. Leissner was concerned at the time and told both Ng and Low about the subpoena.

After receiving the subpoena, Leissner worked to assist Low in purchasing a Mauritian bank. Leissner understood from Low that if Low owned a bank, it would allow for easier movement of money, as the 1MDB scheme had been uncovered, in part, and assets were being frozen around the world. Low was using a middleman, Individual-1, to assist in the acquisition. In September 2016, Leissner set up a shell company called Blackfish International (Ltd.) ("Blackfish") as a Mauritius corporation and opened a bank account at the target bank, Century Banking Corporation ("CBC"). Leissner applied for, but was denied, an application to buy part of CBC. Individual-1 then purchased a CBC stake through Leissner. Specifically, Individual-1 purchased a €10 million option in Blackfish, and then Blackfish bought an option in CBC. Leissner understood that the money from Individual-1 was from Low. Leissner kept a portion of the wire for himself and wired the rest to CBC's owner.[2]

II.     Procedural History

On June 10, 2018, shortly after Leissner deplaned an international flight arriving in Washington, D.C., federal law enforcement agents arrested him pursuant to an arrest warrant issued in this District. Until that point, Leissner had been unaware that a warrant had been issued for his arrest. While still at the airport, Leissner and his attorneys relayed his interest in assisting the government in its 1MDB investigation. Leissner remained in FBI custody that night and began proffering with the government the next day. At his first meeting with the government, while Leissner revealed aspects of the scheme he was involved in, he attempted to divert blame for aspects of the scheme to others, including to his close relatives. However, Leissner quickly changed course, admitting his minimization and providing full details of his true involvement. Thereafter, Leissner voluntarily delayed his presentment and agreed to continue proffering with the government. On June 14, 2018, in a sealed proceeding, Leissner was arraigned on the complaint and released on bond signed by his wife and secured by property.

After his release, and continuing over the next two months, Leissner met with the government numerous times and provided information concerning 1MDB, his role in the criminal scheme, the co-conspirators, and all information he had concerning crimes committed by him or others. Through numerous marathon meetings with the government, Leissner systematically described the international bribery and money laundering scheme Low crafted and

---

[2]     Despite these payments, the CBC acquisition was ultimately canceled by Mauritian banking regulators.

explained the central role he played with Ng in executing the scheme involving the 1MDB Bond Transactions.

On August 28, 2018, Leissner pled guilty to a two-count information charging him with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and with participating in a money laundering conspiracy, all tied to his role in the 1MDB scheme. After his guilty plea, Leissner continued to meet with the government on dozens of occasions, reviewing countless of documents and communications he received related to the 1MDB scheme and other subjects of the government's sprawling investigation.

Over ten days in February 2022, Leissner testified at trial in United States v. Ng Chong Hwa, No. 18-CR-538 (MKB) ("Ng") including through six days of cross examination. At the conclusion of trial, the jury convicted Ng on all counts—conspiracy to violate the anti-bribery provisions of the FCPA; conspiracy to violate the internal accounting controls provisions of the FCPA; and conspiracy to commit money laundering. The Court sentenced Ng principally to 10 years imprisonment, but he has yet to begin serving that sentence.

III.   The Sentencing Guidelines

The government agrees with the Guidelines calculation set out in the Presentence Investigation Report, which determined a Guidelines range of life imprisonment and a restricted range of 300 months given that the statutorily authorized maximum sentences are less than the applicable Guidelines range. This calculation is based on an offense level of 43 and a criminal history category of I.

IV.   Applicable Law

Title 18, United States Code, Section 3553 addresses the imposition of sentence. Section 3553(e) provides that "upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." Similarly, Section 5K1.1 of the Guidelines provides that:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
>
> (a)   The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:
>
>    (1)   the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
>    (2)   the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
>    (3)   the nature and extent of the defendant's assistance;

9

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1.

In addition, it is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

V. Leissner's Cooperation and Substantial Assistance

The government respectfully requests that the Court depart from the applicable Guidelines range based upon Leissner's provision of nearly seven years of extraordinary assistance in the investigation and prosecution of those involved in the looting of 1MDB, as set forth in further detail below.

A. The Timeliness of Leissner's Cooperation

Leissner's cooperation was timely. Long before his arrest, FBI agents served Leissner with a grand jury subpoena as he boarded an international flight. At that time, Leissner immediately contacted his co-conspirators Low and Ng to strategize about what to do—neither Ng nor Low ever voluntarily returned to the United States. More than a year later, when unexpectedly arrested by FBI agents at a Washington, D.C. airport, Leissner made a different choice: he immediately agreed to cooperate and began providing information to the government concerning himself, Low, Ng, and all other co-conspirators involved in the 1MDB scheme. Although Leissner was aware of the government's investigation at the time, he did not know of its scope or the fact that an arrest warrant had been issued for him.

Reflecting his commitment to swift cooperation, unlike cooperators in many complex white-collar cases, Leissner opted not to delay a meeting or test the waters with attorney proffers of his information. Leissner instead met with the government every day for many hours for weeks on end to provide that information directly. He agreed to be contacted by the handling agents without counsel long before his guilty plea, allowing agents to quickly leverage Leissner's information proactively to further the still-covert investigation of those involved in the 1MDB scheme. Given the speed of his cooperation, and because Leissner's cooperation remained completely unknown for a substantial amount of time, law enforcement agents exploited the information Leissner provided with great success and used Leissner to make consensually recorded telephone calls with Low, Ng, and others. These efforts were only made possible by Leissner's swift decision to cooperate fully with the government's investigation.

10

B. The Value, Nature, and Extent of Leissner's Cooperation

Leissner's cooperation was of tremendous value and was central to the government's ability to swiftly indict and successfully prosecute numerous individuals and entities involved in the 1MDB scheme. Leissner's inside view of the conspiracy's origin, growth, and execution were crucial, especially given the conspiracy's international scope—including touchpoints with countries where cooperation with U.S. authorities is nearly nonexistent; the lengths to which his co-conspirators went to hide billions of dollars across the globe; the seniority of the powerful foreign government officials receiving bribes; and the efforts to corrupt and interfere with investigations in the U.S. and abroad. With Leissner's personal knowledge of the conspiracy's most secret and intricate details, the government was able to overcome these challenges.

In his meetings with the government, Leissner detailed all facts known to him about every person, entity, or transaction about whom he was asked, going back decades. He displayed remarkable recall and spoke with precision about what he knew about the scheme, the business deals he had been involved at Goldman and elsewhere, and his motivations for committing the charged crimes. Within a week of meeting with the government, he voluntarily turned over his electronic devices and consented to their forensic examination. Those devices proved to be a trove of information then unknown to the government. From those devices, the government recovered encrypted communications and documents related to the scheme that, given the manner in which they were sent, were recoverable only from Leissner's physical device. Leissner also assisted the government in recovering from Goldman multiple other Blackberry devices that had been in Goldman's custody but would not be turned over without Leissner's consent. The government secured those devices with Leissner's cooperation and uncovered additional messages between Leissner and Low.

Leissner described the mechanics of the scheme to the government, including how he concealed Low's involvement by using personal emails to communicate with Low and Ng throughout, met with Low and Ng on multiple occasions in furtherance of the scheme, opened shell companies to receive diverted 1MDB funds, and moved money at Low's direction. Moreover, because both Low and Ng deleted the entirety of their email accounts after the scheme was uncovered, Leissner was the only source of communications between these three core members of the conspiracy.

Although the government was able to confirm certain events and conduct with independent pieces of evidence, Leissner deciphered multiple other pieces of evidence that, without his assistance, the government would not have fully understood. For example, Leissner explained the import of 2017 and 2018 chats with Low recovered from Leissner's electronic devices that revealed how Low was attempting to move funds without detection even after public scrutiny of the 1MDB scheme increased. The entities involved in those fund flows were, on paper, seemingly legitimate, but with Leissner's assistance, their criminal nature became clear.

Leissner's cooperation led directly to the criminal charges brought in Ng against his co-conspirators Low and Ng; as described above, his lengthy and detailed trial testimony was essential for Ng's conviction. His cooperation also led to the charges in United States v. The Goldman Sachs Group, Inc., No. 20-CR-437 (MKB), and United States v. Goldman Sachs (Malaysia) Sdn. Bhd., No. 20-CR-438 (MKB). Given Goldman's central role in raising the

11

billions of dollars that fueled the bribery scheme, Leissner's insider perspective was essential for each of these cases. As a senior Goldman banker, longtime partner, and member of the criminal conspiracy, Leissner was uniquely positioned to explain how this criminal scheme was formed and then executed inside of a global investment bank. His insight was key to explain how he and Ng evaded Goldman control functions' efforts to mitigate risks that Low presented. By bringing together the documentary record with the on-the-ground private discussions occurring between Leissner, Ng, and other Goldman bankers, Leissner laid out precisely how, as part of the conspiracy, they willfully evaded internal accounting controls designed to catch and stop corrupt deals from occurring at Goldman. Ultimately, in addition to Ng's conviction, the government secured the largest ever penalty paid to the United States in an FCPA case, with Goldman agreeing to pay more than $2.9 billion; Goldman's Malaysian subsidiary pleading guilty; and its parent, The Goldman Sachs Group, Inc., entering into a deferred prosecution agreement.

Leissner has also assisted the government in its effort to trace and forfeit proceeds of the 1MDB scheme. These efforts include his ongoing assistance in the ancillary proceeding before this Court. In re Forfeiture Order of Tim Leissner, No. 23-MC-1505 (MKB). That action focuses on the government's seizure and forfeiture of publicly traded stock Leissner acquired with proceeds from the 1MDB scheme. As part of that litigation, Leissner has continued to meet with the government and has appeared and testified at a sworn deposition about numerous aspects of the share purchases. This information has been crucial to the government's efforts to dismiss numerous baseless claims to these shares by third parties.

In addition to the criminal cases and forfeiture proceedings directly related to the 1MDB scheme, Leissner also provided information about other crimes investigated by the government.[3] 



---

[3] Because the information set out in this paragraph relates, in part, to nonpublic grand jury investigations unknown to Leissner or the public, it is being redacted from the publicly filed version of this letter and submitted to the Court ex parte and under seal. See United States v. Haller, 837 F.2d 84, 87-88 (2d Cir. 1988) (need to maintain grand jury secrecy may be compelling reason justifying sealing); United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation, including the safety of witnesses and law enforcement personnel, and to prevent interference, flight and other obstruction, may be compelling reason justifying sealing).

To put it simply, Leissner's cooperation was essential to the government's successful efforts at holding accountable multiple entities and individuals involved in the 1MDB scheme.

  C. <u>Truthfulness, Completeness, and Reliability of the Information</u>

Leissner's information was exceedingly thorough, covering conduct that spanned more than a decade and involved countless individuals from multiple countries. As he admitted at the <u>Ng</u> trial, Leissner's first meeting with the government after his arrest was mixed with an effort at minimizing his role at certain key points in time, including blaming his ex-wife for money transfers Leissner personally effectuated. Those efforts at minimization were short-lived, as later that same day, Leissner took full accountability for his central role in the 1MDB scheme and gave the unvarnished truth of what happened during the 1MDB Bond Transactions.

Throughout, Leissner has been precise about the things he knew and the things he did not know. He gave a complete picture of the information known to him, and he turned over documents and electronic devices to the government quickly and voluntarily. At many turns, the information provided was inextricably intertwined with some of the most private aspects of his personal life. Even so, as the Court observed at trial in <u>Ng</u>, Leissner was committed to answering every question asked of him, however personal or embarrassing.

The credibility of Leissner's information was made clear in <u>Ng</u>. He was earnest and plain in his testimony and remained consistent throughout direct and cross examination. His information was corroborated in every way by the documents and information the government obtained through its investigation. Leissner's acceptance of responsibility was displayed clearly at trial, as Leissner explained in excruciating detail the criminal conduct he engaged in with Ng and Low, how he had "blown apart" his life and his family's through his actions, and how he felt that cooperating was the first time he could do something his children could admire.

  D. <u>Injury Suffered or Any Danger or Risk of Injury to the Defendant or His Family Resulting from His Assistance</u>

Leissner provided information concerning the role of powerful individuals in a global scheme to bribe government officials in two countries and divert billions of dollars into bank accounts around the world. All the people about whom Leissner provided information had the means, status, power, and motive to interfere with and prevent Leissner's cooperation. At the time Leissner elected to cooperate with the government's investigation, there had already been substantial reporting across Malaysia concerning individuals connected to the 1MDB investigation who had been killed in Malaysia. As Leissner later revealed during his cooperation and at trial in <u>Ng</u>, Low and others had undertaken substantial efforts to obstruct the global investigations into 1MDB. As Leissner testified, Low told Leissner he had enlisted political leaders in the U.S. and abroad to help close investigations into the matter. While those efforts failed, it reflects the lengths Leissner's conspirators were willing to go to avoid prosecution.

Despite the risks and personal stakes, Leissner willingly chose to cooperate. And as in every case, witness safety was top of mind for the government, and it undertook substantial steps to ensure the confidentiality of Leissner's cooperation and his personal safety. Throughout his time cooperating, the FBI took affirmative steps in this regard, a number of which followed a

suspicious incident that occurred near the defendant's residence in California in February 2019. At that time, private security near Leissner's residence observed an individual acting suspiciously near the entrance to the neighborhood. When approached, the individual claimed to have a meeting with Leissner but, when pressed for additional information, the individual acted evasively before getting into a vehicle and leaving. An investigation revealed that the vehicle had been rented by foreign nationals who travelled to the U.S. just days before. On two other occasions between May and June 2019, the tires on Leissner's car were slashed while it was parked in a public location in California; Leissner had also observed an individual taking photographs of his residence from afar. As a result of these incidents and Leissner's ongoing cooperation, the FBI was required to remain in close contact with Leissner and took affirmative steps to ensure his safety and that of his family throughout this case. Given his public testimony at a high-profile trial, Leissner will no doubt continue to face harassment and substantial risks to his personal safety as a direct result of his cooperation.

    Finally, the personal consequences from cooperation are substantial as well. Given his use of his family to advance parts of the criminal scheme at 1MDB, Leissner's personal life was examined in detail throughout the trial in Ng. That public scrutiny was expected and understandable to an extent, but the level of scrutiny shown Leissner was outsized and lasted for years. See, e.g., "Goldman Sach's Tactic in Malaysian Fraud Case: Smear an Ex-Partner," N.Y. TIMES, Jan. 16, 2019; "Ex-Goldman Banker Tim Leissner a 'Double Bigamist,' Lawyer Claims," N.Y. POST, Feb. 15, 2022. The personal and professional fallout from his cooperation will no doubt continue. Leissner has also been permanently barred from the securities industry by the SEC and permanently barred from working for any financial institution by the Federal Reserve Board of Governors. These effects were clear to Leissner from the start of his cooperation. Yet he remained committed to cooperating fully and, as a result, has helped bring to justice many responsible for one of the largest financial crimes in history.

VI.      Conclusion

           For the foregoing reasons, the government respectfully submits this motion to permit the Court, in its discretion, to impose a sentence below the applicable Guidelines range. The government further moves for the portions identified above to be filed under seal and ex parte for the reasons set forth above.

                                                          Respectfully submitted,

                                                          JOSEPH NOCELLA, JR.
                                                          United States Attorney

                               By:      /s/_____
                                                          Alixandra E. Smith
                                                          Drew G. Rolle
                                                          Dylan A. Stern
                                                            Assistant U.S. Attorneys

                                                          Katherine Nielsen
                                                            Trial Attorney
                                                            U.S. Department of Justice,
                                                           Money Laundering & Asset Recovery
                                                           Section

cc:      Henry Mazurek, Esq.
          Ilana Haramati, Esq.
          U.S. Probation Office